IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAWN K. CLARK <u>et al.</u>          *
                                     *
v.                                   *
                                     *     Civil Action No. WMN-11-108
HUMANE SOCIETY OF CARROLL            *
COUNTY, INC. <u>et al.</u>           *
                                     *
    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

<u>**MEMORANDUM**</u>

Before the Court is Defendants' Motion to Dismiss and
Opposition to Request for Certification as Class Action.  ECF
No. 3.  The motion is fully briefed.[1]  Upon a review of the
papers filed and the applicable case law, the Court determines
that no hearing is necessary, Local Rule 105.6, and that the
motion should be granted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Dawn Clark and Elizabeth Tiedemann bring this
action challenging the constitutionality of certain provisions
of the Carroll County Code (Code) which regulate the care and
control of animals.  Code §§ 81-1 <u>et seq.</u>  Chapter 81 of the
Code contains numerous provisions regarding, <u>inter alia</u>, the

---

[1] Plaintiff has filed a motion for leave to file a surreply,
arguing that Defendants' Reply raised new arguments and
contentions.  ECF No. 7.  As explained below, <u>see</u> n.10, the
Court finds that these alleged "new" arguments and contentions
were fairly raised by Defendants in their initial motion and
that Plaintiffs have not shown the need for a surreply.
Plaintiffs' motion will be denied.

licensing, restraint, and care of domestic animals.  The two

provisions cited by Plaintiffs in their Complaint are the

provisions requiring dogs to be licensed and dog owners to keep

their dogs restrained.  Compl. ¶ 7(A) and (B) (citing Code §§

81-2 & 81-5).  According to the Complaint, Carroll County has

contracted with a private entity, Humane Society of Carroll

County, Inc. (HSCC), to enforce these provisions.  Plaintiffs

have named as Defendants: HSCC; Carolyn Ratliff, the Director of

HSCC; HSCC Officers G. Michael Keiner, Brian Rupp, Mark Miller,

and Karen Baker; and the Board of County Commissioners of

Carroll County (the County).

The enforcement provisions in this section of the Code that

are at issue here are relatively straightforward.  Subsection

81-16(A) permits the County to designate persons or agencies to

enforce this portion of the Code.[2]  According to the Complaint,

and as acknowledged by Defendants, the County has designated

HSCC to perform this role pursuant to that authority.

Subsection 81-16(B) permits Animal Control Officers, in their

---

[2] This subsection provides:

The civil and criminal provisions of this chapter
shall be enforced by those persons or agencies
designated by the Board of County Commissioners of
Carroll County.  It shall be a violation of this
chapter to interfere with an Animal Control Officer in
the performance of his or her duties.

discretion, to issue a "notice of violation" to any persons in violation of this section of the Code, or other animal control laws or regulations. The "notice of violation" imposes a fine. The recipient of the notice has the option of paying the fine within 72 hours in full satisfaction of the violation.

If the recipient of the notice elects not to pay the fine, a criminal charging document is initiated and a criminal trial is held in the state District Court. If convicted in the criminal proceedings, "the defendant shall be punished as provided in § 81-17 of this chapter. The fine assessed by the Animal Control Officer, as herein provided, may be increased or decreased by the Court upon conviction as aforesaid." Carroll County Code § 81-16(B). Section 81-17 specifies that one found guilty of violating the County's animal control regulations "shall be deemed guilty of a misdemeanor and shall be punished by confinement in the county jail for not more than 30 days or by a fine up to $500.00, or both. If any violation be continuing, each day's violation shall be deemed a separate violation." Id. § 81-17.

Plaintiffs take issue with many aspects of this enforcement scheme. They complain that HSCC officers arbitrarily set the fines when issuing the notices. Compl. ¶ 13(C). They complain that much of the revenue raised by payments of the fines goes to HSCC to pay for its operations, thus creating a financial

incentive to assess and collect fines.  Id. ¶¶ 25, 35.  They
complain that it is a policy of HSCC not to identify the
"complaining witnesses" who reported the alleged violation to
HSCC.  Id. ¶ 52.  Plaintiff's primary complaint, however, is
that this scheme allows HSCC to use the threat of criminal
prosecution to compel the payment of fines.  Compl. ¶ 33.

As to HSCC's action toward her personally, Plaintiff Clark
alleges that "[o]n at least one occasion in 2010," she was
issued citations for alleged violation of the Code.  Id. ¶ 41.
Clark does not specify what those violations were alleged to be,
but states that the citations demanded fines amounting to
"hundreds of dollars."  Id. ¶ 42.  Clark did not initially pay
the fines and criminal charges were brought.  Before the
criminal case came to trial, however, Clark pleaded guilty,
accepted probation before judgment, and paid the fines.  Id. ¶
46.

Plaintiff Tiedemann alleges the following concerning her
interactions with HSCC.  On three separate occasions during the
winter of 2008 and spring of 2009, Tiedemann was issued
citations for alleged violations of the Code.  Like Clark,
Tiedemann does not specify the nature of the alleged violations,
but states that the citations demanded payment of fines "ranging
from $50 to $300."  Id. ¶ 51.  When Tiedemann elected not to pay
the fines, HSCC officers filed Applications for Statement of

Charges.  Before the case came to trial, Tiedmann paid the fines

"under protest," and a <u>nolle prosequi</u> was entered by the state

on all charges.

Plaintiffs filed this suit on January 13, 2011, and the

suit asserts two counts: Count I brings an "Action for

Deprivation of Civil Rights (42 U.S.C. § 1983);" and Count II

brings an "Action for Attorney's Fees (42 U.S.C. § 1988)."  The

§ 1983 count actually encompasses a number of different claims.

Plaintiffs allege: (1) violations of their Procedural Due

Process Rights, as protected by the Fourteenth Amendment; (2)

violations of their right to be free of excessive fines imposed

arbitrarily, as protected by the Eighth Amendment; (3)

violations of their "right to be secure in persons, houses,

papers and effects against unreasonable seizures without a

finding of probable cause supported by oath or affirmation," as

guaranteed by the Fourth Amendment; and (4) violations of the

"right of an accused to know who are, and to confront, the

witnesses against him or her, and to be presented with a proper

criminal complaint/charging document with notice of the nature

and cause against them upon accusation/charge of a crime," as

protected by the Sixth Amendment.[3]  In addition to attorneys'

---

[3] Plaintiffs also included in the Complaint a request for the
certification of a class of Plaintiffs composed of "all
similarly situated residents of Carroll County, past and
present, who have paid fines to the County or HSCC during the 3

fees, Plaintiffs seek in this action a return of all fines
collected and "money damages in the amount to be determined by
evidence (but to the extent an exact amount is needed in this
pleading then $5,000,000)." Compl. at 15. Defendants have
moved to dismiss the Complaint in its entirety.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), pleadings
must contain "a short and plain statement of the claim showing
that the pleader is entitled to relief." Rule 8 does not
require "detailed factual allegations," but "naked assertions,
devoid of further factual enhancement" are insufficient.
Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 St. Ct. 1937, 1949
(2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570
(2007)) (internal quotations omitted). Likewise, unadorned
accusations and rote recitation of a cause of action's elements
fail to meet the requisite pleading standard. Id.

Instead, to survive a Rule 12(b)(6) motion to dismiss, "a
complaint must contain sufficient factual matter . . . to state
a claim to relief that is plausible on its face." Id. In this
context, the plausibility standard demands more than the mere
possibility of a defendant's liability. Id. To wit, "[a] claim
has facial plausibility when the plaintiff pleads factual

---

years prior to the filing hereof." Compl. ¶ 63. Because the
Court finds that the claims of the named plaintiffs must be
dismissed, it need not reach the issue of class certification.

content that allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged." Id.
When evaluating the sufficiency of a pleading, courts are
required to construe all facts in the light most favorable to
the plaintiff. Ibarra v. United States, 120 F.3d 472, 474 (4th
Cir. 1997).

## III. DISCUSSION

### A. The Heck Doctrine

As a preliminary challenge to the Complaint, Defendants
argue that all of Plaintiffs' claims are barred by a doctrine
announced by the Supreme Court in Heck v. Humphrey, 512 U.S. 477
(1994). In Heck, the Supreme Court held that a § 1983 action
for monetary damages cannot be brought if prevailing in that
action would "necessarily require the plaintiff to prove the
unlawfulness of his conviction or confinement." Id. at 486.
Therefore, before a § 1983 could be brought, the plaintiff must
establish that the criminal case was favorably terminated, i.e.,
"reversed on direct appeal, expunged by executive order,
declared invalid by a state tribunal authorized to make such
determination, or called into question by a federal court's
issuance of a writ of habeas corpus." Id. 486-87.

The Fourth Circuit, however, has recognized an exception to
the Heck doctrine that allows a plaintiff to obtain relief under
§ 1983 "where an individual would be left without any access to

federal court if his § 1983 claim was barred." <u>Wilson v.</u>
<u>Johnson</u>, 535 F.3d 262, 267 (4th Cir. 2008). In reaching that
holding, the Fourth Circuit acknowledged that the Supreme Court
precedent on which it relied is not as clear as it might be.
The Fourth Circuit relied on what is arguably dicta in a five
justice plurality opinion in <u>Spencer v. Kemna</u>, 523 U.S. 1
(1998). Nevertheless, the Fourth Circuit has recognized this
exception and that is the precedent to which this Court is
bound.

    <u>Wilson</u> arose in the context of a prisoner who filed his §
1983 claim after the expiration of his prison sentence. Because
Wilson was no longer in custody, habeas relief was unavailable
to him. Based upon these specific facts, Defendants argue that
the <u>Wilson</u> exception should be limited to individuals who were
convicted to a term of imprisonment, incarcerated and thus
entitled at some previous time to habeas relief, but who have
been released and now no longer can file a habeas petition.
Reply at 2. The <u>Wilson</u> exception, in Defendants' view, is
inapplicable to those like Plaintiffs who were not convicted but
pled guilty or otherwise admitted guilt because, those who have
pled guilty never had a right to habeas relief in the first
place. <u>Id.</u> at 3.

    It is not clear that the <u>Wilson</u> exception should be read so
narrowly. First, while a guilty plea generally bars habeas

relief, it does not bar a constitutional claim that "goes to the very power of the State to bring the defendant into court to answer the charge brought against him." Blackledge v. Perry, 417 U.S. 21, 29 (1974). If meritorious, Plaintiffs' claims arguably might fall within that class of claims. In addition, Plaintiffs raise several other arguments for the inapplicability of the Heck doctrine including: (1) their contention that, because they voluntarily paid the fines before going to trial, there are no "convictions" to be undermined; and (2) that assuming there are "convictions," this § 1983 action does not undermine the propriety of those convictions.

It is difficult if not impossible to determine the impact of the Heck doctrine on Plaintiff's claims at this stage of the litigation. Because the Complaint does not even identify the nature of the Plaintiffs' violations, it is difficult to conclude, with certainty, how Plaintiffs' § 1983 claims would undermine those "convictions." It is not clear from the Complaint what it means that Plaintiff Tiedemann pled guilty "under protest." Because of these difficulties and uncertainties and, more significantly, because Plaintiffs' constitutional claims are clearly without merit, the Court will assume without deciding that Plaintiffs can escape the Heck doctrine and will proceed to examine Plaintiffs' claims.

**B. Eighth Amendment**

As an initial challenge to Plaintiffs' Eighth Amendment claim, Defendants argue that the Eighth Amendment excessive fines provision simply does not apply to the States through the Due Process Clause of the Fourteenth Amendment, citing <u>McDonald v. City of Chicago</u>, 130 S. Ct. 3020, 3035 n.13 (2010).  Mot. at 15.

In <u>McDonald</u>, the Supreme Court considered whether the Second Amendment right to keep and bear arms was extended to the States through the Due Process Clause.  In resolving that issue, the Court summarized those rights guaranteed by the Bill of Rights that have been held to meet the requirements for protection under the Due Process Clause, <u>see</u> <u>id.</u> at 3035 n.12, and those few about which the Court has yet to decide if they would be incorporated.  <u>See</u> <u>id.</u> 3035 n.13.  While the Supreme Court noted that it never decided whether the Eighth Amendment's prohibition of excessive fines applied to the States, nothing in the opinion inferred that this question would be answered in the negative.  Given that the Court's announced criteria for incorporation of a right is "whether a particular Bill of Rights guarantee is fundamental to <u>our</u> scheme of ordered liberty and system of justice," <u>McDonald</u>, 130 U.S. at 3034 (emphasis in original),

this Court is inclined to conclude that the Supreme Court would find the excessive fines provision applicable to the States.[4]

This Court need not ultimately decide the issue, however, as the fines at issue in this action are clearly not excessive. A penalty violates the Excessive Fines Clause if it is "grossly disproportional" to the gravity of the offense. See United States v. Bajakajian, 524 U.S. 321, 334 (1998). Two considerations in the "grossly disproportional" analysis are legislative intent and the gravity of the offense relative to the fine. Id. at 336-37.

Here, Plaintiffs seem to carefully avoid in their Complaint even identifying the provisions of the Code for which they were fined. Because the Complaint only cites the specific provisions related to dog licenses and dog restraint, see Compl. ¶ 7, Defendants assumed in their motion that it was for violations of these provisions that Plaintiffs were cited. Plaintiffs confirm

---

[4] Several years before McDonald, in dicta and without discussion, the Supreme Court had stated that "the Due Process Clause of the Fourteenth Amendment to the Federal Constitution . . . makes the Eighth Amendment's prohibition against excessive fines and cruel and unusual punishments applicable to the States." Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 434 (2001). Numerous courts have cited to the Cooper Industries decision as holding that "[t]he Eighth Amendment's prohibition against excessive fines applies to the states through the Due Process Clause of the Fourteenth Amendment." Qwest Corp. v. Minnesota Public Utilities Comm'n, 427 F.3d 1061 (8th Cir. 2005); Conley v. City of Dunedin, Civ. No. 08-1793, 2009 WL 812061 5 (M.D. Fla. Mar. 25, 2009) (same); King v. Ridley Township, Civ. No. 07-704, 2007 WL 2071871 (E.D. Pa. July 17, 2007) (same).

that in their Opposition.  Opp'n at 20 n.13.  Plaintiffs are
also somewhat cryptic as to the amount of their fines.
Plaintiff Clark alleges that the citations issued to her
assessed fines equal to "hundreds of dollars" but the Complaint
fails to indicate how many citations she received and for how
many violations.  Plaintiff Tiedemann alleges she received
citations on three separate occasions demanding payment of fines
"ranging from $50 to $300," but, like Clark, Tiedemann does not
correlate those amounts to specific alleged violations.

Plaintiffs do not even attempt to argue that fines of under
$300 are "grossly disproportional" to the alleged offenses.
They actually concede that the amounts of the fines "may not be
large or onerous, on their face."  Opp'n at 20.  Instead, they
assert without citation to any authority[5] that, "any fine
assessed without due process is, by definition, excessive."  Id.
at 19.  The alleged violation of due process, however, is a
separate constitutional question which will be addressed below.

As to Plaintiffs' excessive fines claim, the Court finds
that fines in the amount alleged are clearly in line with the
County's interest in protecting the public health, safety, and
welfare and the costs attendant to such a regulatory program.

---

[5] Plaintiffs assert that they believe this is a "logical
corollary" to the holding in McDonald that links the extension
of the protection of rights to actions of the states and the Due
Process Clause.  Id.

**C. Procedural Due Process**

To establish a violation of procedural due process, a plaintiff must show that (1) she had a property interest (2) of which the defendant deprived her, (3) without due process of law. <u>Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach</u>, 420 F.3d 322, 328 (4th Cir. 2005). Procedural due process requires, at a minimum, fair notice and an opportunity to be heard. <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333 (1976). Beyond the minimum requirements of notice and an opportunity to be heard, due process is "flexible and calls for such procedural protections as the particular situation demands." <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972). Furthermore, the Fourth Circuit has held that "to determine whether a procedural due process violation has occurred, courts must consult the entire panoply of predeprivation and postdeprivation process provided by the state." <u>Tri-County Paving, Inc. v. Ashe County</u>, 281 F.3d 430, 436 (4th Cir. 2002).

Plaintiffs contend that, beyond their property interests in the fines assessed against them, they were deprived of the following liberty interests without due process:

    (1) To be free from arbitrary restraints on their conduct;[6]

----

[6] As support for this liberty interest, Plaintiffs cite Justice Harlan's dissent in <u>Poe v. Ullman</u>, 367 U.S. 497 (1962), a

(2) To the possession and control of their own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law;[7]

(3) To freedom from arbitrary arrest and detention;[8]

(4) To be free from government punishment unless and until proved guilty beyond a reasonable doubt at a criminal trial conducted in accordance with all relevant constitutional guarantees.

Opp'n at 15.

The basis of Plaintiffs' contention that these first three liberty interests were violated apparently relates to the manner in which they were handed the notices of violations. Each Plaintiff alleges that, while "not taken into custody by the officer, she was 'arrested' in that the armed and uniformed

---

decision addressing the constitutionality of a statute prohibiting the use of contraceptives.

[7] As support for this liberty interest, Plaintiffs cite Union Pac. Ry. Co. v. Botsford, 141 U.S. 250 (1891), a decision which discussed whether a plaintiff in a personal injury case can be compelled to submit to a surgical examination as to the extent of her injuries. The decision does not mention due process or liberty interests. Plaintiffs note that Botsford was quoted in Terry v. Ohio, 392 U.S. 1 (1968), which set out the circumstances under which police can stop and frisk a criminal suspect.

[8] As support for this liberty interest, Plaintiffs cite Apton v. Wilson, 506 F.2d 83 (D.C. Cir. 1974), which dealt with the mass arrest of protesters at a May Day demonstration. Protesters were arrested without probable cause under procedures that "swept up innocent persons along with the lawbreakers" and "carr[ied] overtones of physical abuse." Id. at 87, 93.

officer[9] made clear by the assertion of authority, that she was not free to leave, that she was detained for a short time period, that during such time she was subject to the officer's control and actions, and otherwise was thus deprived of liberty and freedom of movement."  Compl. ¶¶ 49, 60.  While the Court must accept the factual allegation that Plaintiffs were "detained for a short time period," so that they could be handed the notices, the Court is not bound to accept the legal conclusion, couched as a factual allegation, that they were somehow "arrested" or "seized."  See Twombly, 550 U.S. at 556. The Court finds that these first three "liberty interests" asserted by Plaintiffs are neither supported by the cases Plaintiffs cite nor by the facts Plaintiffs allege.

As to Plaintiffs' fourth identified "liberty interest," -- to be free from government punishment unless and until proved guilty beyond a reasonable doubt at a criminal trial conducted in accordance with all relevant constitutional guarantees -- the Court finds simply that Plaintiffs were not deprived of that interest.  They were provided the opportunity to challenge the charges in a criminal trial and they elected not to do so. Plaintiffs make no claim that there was anything infirmed about

---

[9] Defendants assert that animal control officers are not entitled to and do not carry firearms.  Reply at 12.  Because the Court is deciding a motion to dismiss, however, it will assume the truth of Plaintiffs' allegations.

the process provided after the criminal charges were filed.  See
Opp'n at 17.

Plaintiffs do, of course, have a property interest in the
amount of the fine assessed and paid.  See Herrada v. City of
Detroit, 275 F.3d 553, 556 (6th Cir. 2001) (noting that an
individual "clearly has a property interest in her money").
Plaintiffs' due process claim for the deprivation of that
property interest, however, fails for a number of reasons.

First, courts have consistently held that, where an
individual elects to pay a civil fine and thus avoid the
criminal procedures provided to contest the alleged violation,
that individual lacks standing to challenge the procedures they
declined to use.  Herrada v. City of Detroit, 275 F.3d 553, 558
(6th Cir. 2001); Mills v. City of Springfield, Civ. No. 10-4036,
2010 WL 3526208, (W.D. Mo. Sept. 3, 2010); Shavitz v. City of
High Point, 270 F. Supp. 2d 702 (M.D.N.C. 2003); Van Harken v.
City of Chicago, 906 F. Supp. 1182 (N.D. Ill. 1995); Walter v.
City of Chicago, Civ. No. 91-6333, 1992 WL 88457, at *3 (N.D.
Ill. Apr. 27, 1992).  The reason for this holding is
straightforward: "Plaintiff has not taken advantage of the
procedural processes offered to him, therefore he has not been
harmed one way or another by such processes and, accordingly,
cannot challenge them on due process grounds."  Shavitz, 270 F.
Supp. 2d at 711 n.8; see also, Walter, 1992 WL 88457 at *3

16

(observing that the plaintiff "cannot trace any deprivation or threatened deprivation of property to any of the adjudicative procedures . . . that he questions because he never made use of them").

Second, assuming Plaintiffs have standing to challenge the procedures provided under the Code provisions on due process grounds, the Court would find that the procedures easily pass constitutional muster.  In a pair of decisions issued on the same day by the United States District Court for the Western District of Michigan, that court found constitutional an enforcement scheme very similar to the scheme challenged by Plaintiffs in the instant action.  Gradisher v. County of Muskegon, 255 F. Supp. 2d 720 (W.D. Mich. 2004); Silvernail v. County of Kent, Civ. No. 02-559, 2003 WL 1869206 (W.D. Mich. Feb. 24, 2004).  This Court finds the Michigan court's analysis instructive.

The municipal ordinances at issue in Gradisher and Silvernail were ordinances that allowed a private corporation, Check Enforcement Unit, Inc. (CEU), to contract with the respective county governments to "process, recover, investigate, and assist in the enforcement of dishonored checks in violation of applicable state laws or township ordinances."  Gradisher, 255 F. Supp. 2d at 723.  Pursuant to the contract, when a check payable to a participating merchant is dishonored, the check is

forwarded to CEU and CEU then sends out a series of notices to the check writer. The first notice, entitled "Due Process Notice," demands payment of the amount of the dishonored check plus bank fees payable to the merchant, plus a $25 Government Assessment Fee payable to the respective county. The Notice requests payment within five business days and threatens, "FAILURE TO MAKE PAYMENT CAN RESULT IN A WARRANT FOR YOUR ARREST." Id. at 724. If payment is not received, CEU sends out a second noticed entitled "Final Notice," informing the recipient that "you are now in violation of criminal law" and repeating the warning regarding the possibility of arrest. If no response is forthcoming, a third notice, entitled "Interview Notice," is sent informing the check writer that an investigation has begun for the consideration of criminal prosecution and instructing him or her to report to the Sheriff's Department for an interview. All three notices are sent on Sheriff's Department letterhead and provide a telephone number to call if there are any questions. The plaintiffs in both cases ultimately paid the amounts sought, including the Government Assessment Fee.

The plaintiffs then filed suit under § 1983 alleging that the enforcement scheme violated due process by: (1) imposing a $25 Government Assessment Fee on persons without a criminal complaint having been filed with the Sheriff's Department,

18

without a determination of the check writer's intent to defraud,
and without a determination to prosecute having been made; (2)
imposing a $25 Government Assessment Fee without providing
notice and an opportunity to be heard by an impartial government
official; and (3) by allowing the CEU defendants to impersonate
the Sheriff's Department.  Id. at 725.  In dismissing the due
process claims, the district court first relied on a standing
argument similar to the holdings of the cases cited above, but
without directly referencing "standing."  The court reasoned
that, "with regard to whether a deprivation occurred . . . an
individual's voluntary surrender of property to the government
precludes a due process claim because, in such cases, there has
been no government interference with the individual's property
interest."  Id. at 728.

The court went on, however, to evaluate the process
provided in light of the three factors set out by the Supreme
Court in Mathews v. Eldridge, 424 U.S. 319 (1976), for
determining whether a given procedure comports with due process:

> "First, the private interest that will be affected by
> the official action; second, the risk of an erroneous
> deprivation of such interest through the procedures
> used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the
> Government's interest, including the function involved
> and the fiscal and administrative burdens that the
> additional or substitute procedural requirement would
> entail."

Gradisher, 255 F. Supp. 2d at 730 (quoting Mathews, 424 U.S. at 335). As to the first factor, the Michigan court held that the private interest in the $25 fee is "relatively minimal," comparing that interest to the "loss of an essential service, such as electricity or with the loss of employment, both of which would require greater protection." Id. at 730-31 (citing Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 14 n.15 (1978) and Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542-43 (1985)).

As to second factor, the court noted that there is no indication that additional procedural safeguards would have reduced the risk of an erroneous deprivation of the plaintiffs' money. They were given a number to call to explain why they should not be required to pay the Government Assessment Fee and they did not attempt to call the number. Furthermore, the court noted that, if the plaintiffs failed to pay the fine, "the County Defendants could not have deprived Plaintiffs of their property without first filing a civil or criminal action, because the Ordinance does not authorize the County to take any action against individuals that fail to respond other than through a civil or criminal proceeding." Id. at 731.

Finally, as to the third factor, the court recognized the counties' interest "in resolving bad check complaints outside of the criminal system, thereby reducing administrative costs

associated with such violations and avoiding unnecessary criminal or civil proceedings." Id. "Outsourcing" the handling of these violations, the court observed, permitted the counties to accomplish these goals. Furthermore, providing additional safeguards, such as a full hearing, would increase the counties' costs and administrative burdens without any significant benefit to the plaintiffs. Id.

The Sixth Circuit affirmed Silvernail and Gradisher, concurring in the reasoning of the district court. Silvernail v. County of Kent, 385 F.3d 601, 605 (6th Cir. 2004); Gradisher v. County of Muskegon, 108 Fed. App'x 388 (6th Cir. 2004). The Sixth Circuit added, "had plaintiffs failed to pay the assessment fee, they would have been entitled to the full panoply of due process protections when and if the County instituted a criminal action to collect the fee." Silvernail, 385 F.3d at 605.

Similarly here, while the potential fines are somewhat greater than the fines in Silvernail and Gradisher, the private interest is relatively minimal. As to the value of additional safeguards, Defendants correctly observe that if a due process hearing were held with respect to all notices, the most that would be accomplished is that the accused violator would deny responsibility and criminal proceeding would still follow. Finally, outsourcing the initial civil fine portion of the

enforcement scheme is a legitimate means of reducing administrative costs and reducing the need for unnecessary criminal proceedings.

The Court finds that the Complaint does not state a viable due process claim.

### D. Fourth Amendment

The precise nature of Plaintiffs' Fourth Amendment claim is not clear. In the Complaint, they assert that Defendants violated their "right to be secure in persons, houses, papers and effects against unreasonable seizures without a finding of probable cause supported by oath or affirmation." Compl. ¶ 76. This would appear to be related to their claim that they were "arrested" or "seized" during the brief periods of time in which they were being handed the notices of violation. As stated above, the Court need not accept their legal conclusion, unsupported by facts, that they were ever arrested.

Elsewhere in their Complaint, Compl. ¶ 77, and in opposing the motion to dismiss, Plaintiffs cast their Fourth Amendment claim as a claim that the issuance of the notices of violation is a criminal fine that cannot be issued without a finding of probable cause. They also contend that, if they did not pay the fines, they were "punished" with the "sanction" of facing a criminal prosecution and possible incarceration. Opp'n at 21. The fallacy here is that individuals are not "punished" or

"sanctioned" for not paying the civil fines, they are simply given a choice.  If they do not wish to challenge the alleged violation, they can pay the fine.  If they do wish to challenge the violation, Defendants are required to make a showing of probable cause before the statement of criminal charges can be issued.  Individuals can then proceed to a criminal phase in which Plaintiffs agree all of their constitutional rights would be protected.  Id. ("Plaintiffs . . . do not contest their treatment during the court criminal proceedings.").

### E. Sixth Amendment

Plaintiffs' Sixth Amendment claim is similar to their Fourth Amendment claim and suffers the same impairments.  The Sixth Amendment provides that "[i]n criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527, 2531 (2009).  Plaintiffs acknowledge that, in a typical criminal prosecution, Sixth Amendment rights attach at the time of the filing of the criminal charging document.  Opp'n at 22.  Plaintiffs argue, however, that the Code "sets up a scheme that is not a typical criminal prosecution."  Id.  They contend that the timing of the issuance of the fine leaves them without the "most rudimentary supporting facts prior to the imposition of a criminal sanction [in] violat[ion] of the 6th Amendment."

Again, Plaintiffs are treating the filing of a criminal charge as the imposition of a criminal sanction. It is not a criminal sanction, it is simply the beginning of the criminal process.[10] Plaintiffs acknowledge that the Statement of Charges they received complied with all constitutional requirements. Opp'n at 23. Accordingly, the Court finds Plaintiffs were afforded their Sixth Amendment rights.

## IV. CONCLUSION

For the reasons stated above, the Court will grant Defendants' motion to dismiss and will dismiss the Complaint in its entirety. A separate order will issue.

---

[10] Plaintiffs based the request for leave to file a surreply on "Defendants' new claim" that the fines assessed in the Notices of Violation "somehow mysteriously and automatically morph from 'civil' into 'criminal' fines." ECF No. 7 at 1. Defendants clearly set out the civil/criminal aspects of the enforcement scheme in their opening memorandum. See Mot. at 14 (noting that "criminal prosecution is avoidable if a civil fine is paid"); 15 (explaining that civil fines like those assessed in the notices of violation typically do not fall within the scope of the Eight Amendment); 18 (opining that Plaintiffs' property interest "presumably lies in the civil penalty that was assessed against them in connection with the citations they received); 21 (noting that "if Plaintiffs chose not to pay the civil fines, then a criminal charging document and subsequent trial" would follow). Furthermore, the Code clearly describes a two-part civil/criminal procedure. See § 81-16(A) ("The civil and criminal provisions of this chapter shall be enforced by those persons or agencies designated . . ."); § 81-16(B) ("in the evnt that such fine is not paid within the time prescribed, a criminal charging document shall be initiated").

_____/s/_____
                    William M. Nickerson
                    Senior United States District Judge


DATED: July 13, 2011.